UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN P. MORGAN,

                                        NO. CIV. S-09-2649 LKK/DAD

       Plaintiff,

    v.

                                      O R D E R

JANET NAPOLITANO, SECRETARY,
U.S. DEPARTMENT OF HOMELAND
SECURITY, IMMIGRATION AND
CUSTOMS ENFORCEMENT, FEDERAL
PROTECTIVE SERVICE,

       Defendants.

_____/

    This is an employment discrimination case arising under Title VII, the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA"). Plaintiff's Fifth Amended Complaint ("FAC") alleges four claims for relief: (1) retaliation for plaintiff's wife's role as an attorney representing other Department of Homeland Security employees in discrimination claims against the agency; (2) retaliation because of perceived aiding and abetting his wife's representation of those employees; (3) direct retaliation for plaintiff's own participation in

discrimination claims by co-workers; and (4) direct age discrimination and retaliation. Defendant has filed a motion to dismiss the Fifth Amended Complaint ("FAC"), and plaintiff opposes. For the reasons stated below, defendant's motion is DENIED.

## I. Background[1]

Plaintiff began working for Federal Protective Services ("FPS") in December, 2003. At that time, FPS was part of the General Services Administration, but during the course of plaintiff's employment, it became a part of the Department of Homeland Security ("DHS"). Plaintiff was employed as a Criminal Investigator with the agency in Sacramento.

**A. Plaintiff's age and disparaging comments**

Plaintiff was born in 1947, and was over 40 years old at all relevant times. On several occasions, Deputy Director of Operations, Paul Durette and other agency officials expressed a preference for hiring "youthful and vigorous" employees. The comments were heard by Region 9 Chief Donald Meyerhoff in September 2004, and again some time in between March 2005, and August 2005. Additionally, Mr. Meyerhoff observed Durette refer to a list of older employees as a "hit list," of people that Durette wanted eliminated from the agency. FAC ¶ 30.

**B. Plaintiff's wife's representation of agency employees**

Plaintiff's wife, Rayna Becker, is an attorney who has

_____

[1] The background statement is derived from plaintiff's complaint, the factual allegations of which are taken as true for purposes of this motion. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

2

represented agency employees in discrimination cases against the agency. Between June 1998, and June 2001, Plaintiff's wife represented Margaret Koehler in complaints about Title VII violations, sexual harassment, sex discrimination, retaliation, and agency non-compliance with a mediation agreement. From June 1998 to May 2003, Becker represented Michael Conrad in complaints for Title VII retaliation and non-selection for a promotion. Becker also represented Conrad in disability discrimination and retaliation claims from November 2004 to June 2006. From June 1998 to March 2004, Becker represented David Current in a complaint for retaliation and non-selection for a promotion. From January 1999 to November 2000, Becker represented Tracy Kita in three EEO complaints stemming from hostile work environment and retaliation. From May 1999 to January 2004, Becker represented Joseph DeLisle, Jr., in complaints of Title VII retaliation, a workers' compensation claim, and other employment matters. From December 2004 until June 2005, Becker represented Ronald Brewster in a complaint for age and disability discrimination. Becker also represented plaintiff in the EEO proceedings regarding the discrimination claims that form the basis of this action, and also represents plaintiff in this action. Becker has represented other employees in similar claims against the agency. FAC ¶ 32.

In the period between March 2005 and August 2005, Durette complained to Meyerhoff that plaintiff's wife was representing DHS employees in discrimination claims against the agency. FAC ¶ 31.

In an email dated October 28, 2005 from FSP Region 9 director

3

1   Joseph Loerzel to Deputy Director Kenneth Ehinger, Loerzel
2   recommended that plaintiff not be selected for a Chief position for
3   which plaintiff had applied. In the email, Loerzel stated
4   "plaintiff's wife is an attorney who handles many of FSP's regional
5   labor cases. . . Without getting into the weeds and suggesting
6   improprieties, she seems to get background information on these
7   cases that attorneys' [sic] usually don't have. . . please keep
8   this correspondence confidential." FAC ¶ 35. Ehinger forwarded the
9   email to Durette the same day. Plaintiff did not discover the email
10  until March 20, 2008.

11  **C. Plaintiff's activity opposing discrimination within the agency**

12      As a union representative, plaintiff opposed race
13  discrimination, age discrimination, and retaliation on behalf of
14  other FSP employees, including Nathan Bailey and Douglas Neibauer.
15  Plaintiff's participation in the Bailey and Neibauer matters took
16  place from on or about April 2007 to August 2007. FAC ¶ 75.

17  **D. Adverse employment actions**

18      According to his complaint, plaintiff was subjected to a
19  number of adverse employment actions. Plaintiff alleges that the
20  adverse employment actions began in October, 2005. Prior to that
21  date, plaintiff had received praise for his accomplishments, and
22  had been put in positions of great responsibility, including
23  serving as Acting Supervisory Criminal Investigator on a temporary
24  basis. In June, 2005, Acting Regional Director Russell Oase
25  requested that plaintiff be put in a permanent Chief, Threat
26  Management Branch position. Oase ordered Bruce Hori to prepare the

4

1  paperwork to place plaintiff in the position, which was vacant at
2  the time. Hori did not do the requisite paperwork. Plaintiff had
3  previously received praise from Loerzel for his accomplishments,
4  and was entrusted with special responsibilities by Loerzel.

5       Following the October 28, 2005, email regarding plaintiff's
6  wife, plaintiff suffered numerous adverse employment actions. In
7  November, 2005, Durette cancelled plaintiff's selection for the
8  permanent Chief, Threat Management Branch position that Oase had
9  previously awarded to plaintiff. Durette ordered that the position
10  be re-announced on a nation-wide basis with a relocation allowance.

11       In November, 2005, plaintiff's previously scheduled annual
12  leave was cancelled. It was FSP practice to cancel such leave only
13  in emergency situations, and there was no emergency situation
14  requiring the cancellation of plaintiff's leave. Plaintiff was
15  allowed to take his leave only after Deputy Regional Director Oase
16  intervened.

17       Starting on November 8, 2005, when plaintiff returned to
18  Sacramento from his Acting Chief position in San Francisco,
19  plaintiff was not provided a special agent to work with. This
20  lasted for two years, and was against agency practice. Working
21  without a special agent jeopardized plaintiff's safety and
22  interfered with his ability to conduct proper criminal
23  investigations.

24       On November 13, 2005, plaintiff learned that he had not been
25  placed in the Chief Threat Management Branch position after it was
26  re-announced by Durette.

1   On December 6, 2005, supervisor Rudy Negrete told plaintiff
2   to come to San Francisco immediately to meet with agency personnel.
3   Although plaintiff was already scheduled to be in San Francisco the
4   following day, Negrete demanded plaintiff's immediate presence.
5   Other employees who were asked to report to San Francisco were
6   given reasonable notice.
7   On January 12, 2006, Negrete gave plaintiff a notice of a
8   proposed five-day suspension for "Willful Refusal to Comply with
9   and Order, Direction, Instruction, or Assignment of a Supervisor
10   or Other Management Official." The notice named Ruben Ballestros
11   as the supervisor whose order plaintiff had failed to comply with.
12   Plaintiff and Ballestros has discussed plaintiff's trip to San
13   Francisco by telephone, but Ballestros had not issued an order. In
14   issuing the suspension notice, Negrete circumvented the normal
15   chain of command by preparing and issuing the suspension notice
16   without the knowledge of plaintiff's direct supervisor, Oase.
17   Plaintiff was a member of the American Federation of Government
18   Employees ("AFGE"), and was covered by a collective bargaining
19   agreement and entitled to a grievance procedure to challenge the
20   proposed five-day suspension. Plaintiff initiated the grievance
21   procedure. In March, 2006, plaintiff was told by management that
22   he did not qualify for union representation. Plaintiff's request
23   for additional time to submit a response to the proposed suspension
24   was denied, even though such extensions were typically granted
25   freely. Ignoring the union's attempt to oppose plaintiff's
26   suspension through the grievance procedure, Dean Hunter suspended

1  plaintiff without pay for five days, starting March 13, 2006. Prior
2  to the five-day suspension, plaintiff had never been disciplined
3  in any manner. In a separate grievance, Labor Arbitrator Kathy L.
4  Eisenmenger held that plaintiff and others in his position were
5  included in the bargaining unit and were covered by the collective
6  bargaining agreement.

7      In January 2006, after receiving the suspension notice, but
8  before the actual suspension, Negrete and Ballestros required
9  plaintiff to return the government vehicle that had been assigned
10 to plaintiff the previous day. In its place, plaintiff received a
11 vehicle that was not properly equipped for criminal investigations.
12 The new vehicle lacked necessary emergency equipment, was
13 identified as a law enforcement vehicle, and was not useful for
14 undercover and investigative assignments. The vehicle did not have
15 lights, a siren, door locking mechanisms, a radio for communication
16 with FSP, or enough trunk space to hold the equipment needed.
17 Because of the lack of trunk space, some equipment, such as a
18 breathing apparatus, weapons, ammunition, cameras, and forensic
19 tools would have to be left in the passenger or rear seating area,
20 in view of the public. It was standard practice for FSP agents such
21 as plaintiff to be assigned an unmarked sport utility vehicle,
22 rather than a vehicle of the type that was issued to plaintiff.

23     On January 19, 2006, plaintiff received a memo stating that
24 he had been overpaid for one pay period. On January 23, 2006,
25 Ballestros denied plaintiff's request to take leave to attend his
26 aunt's funeral. Plaintiff had accumulated the leave, and was

1   current with all of his assignments at the time. Ballestros did not

2   provide a reason for denying the leave.

3       In February, 2006, the agency announced selections for two

4   positions for which plaintiff had applied. Plaintiff was not

5   selected. Plaintiff learned of the selections when they were

6   announced generally, contrary to the normal practice of informing

7   applicants of the selections in advance.

8       On February 21, 2006, plaintiff became aware that he had not

9   been selected for a Chief, Threat Management Branch position for

10  which he had applied. Plaintiff was more qualified than the

11  selected candidate, Bruce Applin. In the selection process,

12  plaintiff was not given five preference points for military

13  service. Applin was approximately 36 years old, and did not have

14  any prior history of opposing discrimination within the agency.

15      On the same day, plaintiff became aware that he had not been

16  selected for another position within the agency. The selected

17  applicant, John Hartman, was less qualified than plaintiff, younger

18  than plaintiff, and did not have a history of opposing

19  discrimination within the agency. Hartman was color blind, and

20  therefore not medically qualified for the position.

21      Some time prior to March 23, 2006, plaintiff was contacted by

22  an EEO investigator requesting information from another employee's

23  file. Plaintiff had been involved in that employee's employment

24  discrimination complaint. On March 23, 2006, that employee's

25  management file went missing, and plaintiff was unable to respond

26  to the EEO investigator's request without the file. Plaintiff had

last left the file in the possession of Negrete. The lack of access to the file caused plaintiff to appear less than competent in the eyes of his supervisors and co-workers.

In June 2006, Regional Director Dade made disparaging comments about EEO complainants at a meeting where plaintiff was present. Plaintiff had a practice of openly tape recording staff meetings, but did not tape record the meeting in which Dade made the disparaging remarks. Shortly after the meeting, plaintiff reported the remarks to EEO manager Lewis. Plaintiff told District Commander Canton that he had reported the comments to Lewis. Canton, in turn, told Dade that plaintiff had reported to comments to Lewis. Canton and Dade believed that plaintiff had a tape recording of the comments. Thereafter, at a date not specifically known to plaintiff, agency officials searched plaintiff's office without his consent, and seized all tape recordings. On December 1, 2006, plaintiff's office was searched again, and his personal and government property were seized. The personnel who conducted the search did not follow normal policies and procedures. In March, 2007, plaintiff was informed that he was required to be interviewed about the search and about his tape recordings, and that he would not be allowed to have a union representative present. Plaintiff reported to the interview, which was held in a small interrogation room. The interview was conducted by Special Agents Anderson Wright and Adrian Carter. During the interview, Wright yelled and screamed at plaintiff, and slammed his hand on the table in front of plaintiff. Although most of the interview was recorded, Wright

1  turned the tape recorder off when he yelled at plaintiff.

2  Around December 8, 2006, a request that plaintiff had made for
3  Factfinder Training was denied. Other employees were approved for
4  the training.

5  On April 4, 2007, plaintiff was advised that Hartman had a
6  videotape of plaintiff and Oase playing golf together, and that
7  management was concerned that they were playing golf together while
8  on leave. At the time, plaintiff was on approved annual leave.

9  On or about August 10, 2007, plaintiff received a Notice of
10  Proposed Removal. The notice proposed that plaintiff be removed
11  from federal employment for tape recording conversations without
12  consent of the parties, and for lack of candor. Plaintiff began
13  soliciting witnesses in order to oppose the proposed removal. On
14  September 13, 2007, plaintiff received a "Cease and Desist Order,"
15  signed by Canton. The order prohibited plaintiff from contacting
16  any employees for information, except through the mail. On October
17  22, 2007, the charge of tape recording conversations without
18  consent was upheld by manager Richard K. Cline, and the charge of
19  lack of candor was not sustained. Plaintiff was suspended for
20  fourteen days without pay. The suspension was vacated by an
21  arbitrator in a grievance brought by plaintiff's union in 2009,
22  after plaintiff had already served the suspension.

23  While on suspension, plaintiff made arrangements to complete
24  his mandatory handgun qualification before returning to work.
25  Plaintiff requested that Agent Rivero not be the one to conduct the
26  qualifying session, because of previous problems plaintiff had

1   experienced with Rivero. Plaintiff arranged for Canton to be the
2   firearms instructor. When plaintiff reported to the range on
3   November 29, 2007, he saw Negrete and Rivera also entering the
4   building. Canton was not present, despite the assurances that
5   plaintiff had received when he arranged for the qualifying session.
6   After entering the soundproof firing range with only Negrete and
7   Rivera, plaintiff became very concerned that Rivero and Negrete
8   would physically harm him or even shoot him in a "feigned
9   emergency." FAC ¶ 90. Plaintiff continues to experience anxiety
10  stemming from this incident.

11      On December 11, 2007, plaintiff was interviewed for a position
12  for which he had applied. Durette arranged for the interviewers to
13  be people against whom plaintiff had previously filed EEO
14  complaints.

15      The next day, plaintiff was informed that he was the subject
16  of an investigation, and that an interview would take place on
17  December 17, 2007 in Oakland. Plaintiff was told that he could not
18  use his government vehicle to pick his union representative up at
19  the airport in order to attend the meeting with plaintiff. Even
20  though the interview was work-related, and the union representative
21  was an FSP employee, plaintiff was required to use his own vehicle
22  to retrieve the union representative from the airport. The
23  interview took place in a small room, and plaintiff was under great
24  stress throughout. After the interview, plaintiff sought and
25  received medical care for anxiety and high blood pressure.

26      From December 27, 2007 until December 8, 2007, plaintiff was

11

1   on sick leave. While on sick leave, plaintiff was requested to be
2   interviewed. Also while on sick leave, plaintiff was required to
3   be involved in a civil case filed by the U.S. Attorney's office.
4   Plaintiff had had very limited involvement in a case filed by a
5   Sikh employee contesting FSP policy regarding headwear. Despite his
6   limited involvement and his sick leave status, the agency did not
7   substitute plaintiff out of the complaint, and replace him with
8   another official. Plaintiff was required to conduct further work
9   in the case, including reviewing a settlement agreement, while on
10  sick leave.
11      On June 11, 2008, while still on sick leave, plaintiff was
12  called to testify in a felony stolen vehicle case for which he was
13  the   investigating   agent.   After   his   request   to   testify
14  telephonically   was   denied,   plaintiff   requested   permission   to
15  receive official administrative paid time in order to prepare to
16  testify, and to testify. The request was denied. On June 13, 2008,
17  plaintiff   was   subpoenaed   to   testify   in   the   trial.   Plaintiff's
18  supervisor told him that he was not allowed to testify.
19      Various agency employees continued to contact plaintiff while
20  he   was   on   sick   leave.   In   March   and   April,   Rivero   demanded
21  additional   medical   documentation   from   plaintiff,   even   though
22  plaintiff   regularly   provided   medical   information   to   his
23  supervisors. On May 16, 2008, Regional Director McNamara emailed
24  another   agency   employee,   stating   that   plaintiff   had   already
25  submitted all of the medical documentation that was required.
26      In June, 2008, plaintiff received notification that he was

barred from entering FSP office space without prior approval, even though plaintiff held a top secret security clearance.

On June 19, 2008, plaintiff was placed on AWOL status for not attending an interview that was scheduled while plaintiff was on leave. Plaintiff was not notified beforehand, and nor was plaintiff's union representative.

Since October 28, 2005, when Loerzel sent the email about plaintiff's wife's activity, plaintiff has not been placed in any "acting" supervisory positions, despite his qualification for such positions. Prior to the email, plaintiff was regularly placed in acting supervisory positions. Serving as an acting supervisor is important for career advancement within the agency. The agency's failure to select plaintiff for an acting supervisor position has "severely jeopardized Plaintiff's chances for future selections on supervisory job openings to which he may have aspired and successfully qualified." FAC ¶ 65. In his complaint, plaintiff lists several positions that he applied for, but for which he was not hired.

**E. Administrative Proceedings**

Plaintiff has initiated three separate EEO complaints. On or about March 21, 2006, plaintiff contacted an EEO counselor to complain about retaliation and age discrimination. Plaintiff later filed a formal complaint alleging discrimination and hostile work environment "through a series of actions beginning on or about November 4, 2005." FAC ¶ 6. This complaint was assigned the number HS-06-ICE-002648 ("2648"). On or about February 22, 2008, plaintiff

1  contacted an EEO counselor to complain about retaliation and age

2  discrimination. He filed a formal complaint in that matter, number

3  HS-08-ICE-004459 ("4459"). FAC ¶ 18. On or about July 25, 2008,

4  plaintiff contacted an EEO counselor to complain about retaliation

5  and age discrimination. Plaintiff filed a formal complaint, HS-08-

6  ICE-007526. FAC ¶ 22. Each of the EEO complaints alleged

7  "discriminatory non-selection of two positions for which plaintiff

8  had applied," in addition to hostile work environment.

9  **II. Standards**

10  **A. Standard for a 12(b)(6) Motion to Dismiss**

11      A Fed. R. Civ. P. 12(b)(6) motion challenges a complaint's

12  compliance with the pleading requirements provided by the Federal

13  Rules.  Under Federal Rule of Civil Procedure 8(a)(2), a pleading

14  must contain a "short and plain statement of the claim showing that

15  the pleader is entitled to relief."  The complaint must give

16  defendant "fair notice of what the claim is and the grounds upon

17  which it rests."  <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555

18  (2007) (internal quotation and modification omitted).

19      To meet this requirement, the complaint must be supported by

20  factual allegations. <u>Ashcroft v. Iqbal</u>, ___ U.S. ___, ___, 129 S.

21  Ct. 1937, 1950 (2009).  "While legal conclusions can provide the

22  framework of a complaint," neither legal conclusions nor conclusory

23  statements are themselves sufficient, and such statements are not

24  entitled to a presumption of truth.  <u>Id.</u> at 1949-50. <u>Iqbal</u> and

25  <u>Twombly</u> therefore prescribe a two step process for evaluation of

26  motions to dismiss.  The court first identifies the non-conclusory

14

1  factual allegations, and the court then determines whether these

2  allegations, taken as true and construed in the light most

3  favorable to the plaintiff, "plausibly give rise to an entitlement

4  to relief." Id.; Erickson v. Pardus, 551 U.S. 89 (2007).

5       "Plausibility," as it is used in Twombly and Iqbal, does not

6  refer to the likelihood that a pleader will succeed in proving the

7  allegations.   Instead, it refers to whether the non-conclusory

8  factual allegations, when assumed to be true, "allow[] the court

9  to draw the reasonable inference that the defendant is liable for

10 the misconduct alleged."   Iqbal, 129 S.Ct. at 1949. "The

11 plausibility standard is not akin to a 'probability requirement,'

12 but it asks for more than a sheer possibility that a defendant has

13 acted unlawfully."   Id. (quoting Twombly, 550 U.S. at 557).   A

14 complaint may fail to show a right to relief either by lacking a

15 cognizable legal theory or by lacking sufficient facts alleged

16 under a cognizable legal theory. Balistreri v. Pacifica Police

17 Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

18 **B. Standard for a 12(b)(1) Motion to Dismiss**

19      It is well established that the party seeking to invoke the

20 jurisdiction of the federal court has the burden of establishing

21 that jurisdiction exists.   KVOS, Inc. v. Associated Press, 299 U.S.

22 269, 278 (1936); Assoc. of Medical Colleges v. United States, 217

23 F.3d 770, 778-779 (9th Cir. 2000).   On a motion to dismiss pursuant

24 to Fed. R. Civ. P. 12(b)(1), the standards that must be applied

25 vary according to the nature of the jurisdictional challenge.

26      When a party brings a facial attack to subject matter

15

1  jurisdiction, that party contends that the allegations of
2  jurisdiction contained in the complaint are insufficient on their
3  face to demonstrate the existence of jurisdiction. <u>Safe Air for</u>
4  <u>Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). In a Rule
5  12(b)(1) motion of this type, the plaintiff is entitled to
6  safeguards similar to those applicable when a Rule 12(b)(6) motion
7  is made. <u>See</u> <u>Sea Vessel Inc. v. Reyes</u>, 23 F.3d 345, 347 (11th Cir.
8  1994), <u>Osborn v. United States</u>, 918 F.2d 724, 729 n.6 (8th Cir.
9  1990); <u>see also</u> 2-12 Moore's Federal Practice - Civil § 12.30
10 (2009). The factual allegations of the complaint are presumed to
11 be true, and the motion is granted only if the plaintiff fails to
12 allege an element necessary for subject matter jurisdiction.
13 <u>Savage v. Glendale Union High Sch. Dist. No. 205</u>, 343 F.3d 1036,
14 1039 n.1 (9th Cir. 2003), <u>Miranda v. Reno</u>, 238 F.3d 1156, 1157 n.1
15 (9th Cir. 2001). Nonetheless, district courts "may review evidence
16 beyond the complaint without converting the motion to dismiss into
17 a motion for summary judgment" when resolving a facial attack. <u>Safe</u>
18 <u>Air for Everyone</u>, 373 F.3d at 1039.

19      Alternatively, when a party brings a factual attack, it
20 "disputes the truth of the allegations that, by themselves, would
21 otherwise invoke federal jurisdiction." <u>Id.</u> Specifically, a party
22 converts a motion to dismiss into a factual motion where it
23 "present[s] affidavits or other evidence properly brought before
24 the court" in support of its motion to dismiss. <u>Id.</u> Unlike in a
25 motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court need
26 not assume the facts alleged in a complaint are true when resolving

16

1  a factual attack. Id. (citing  White v. Lee, 227 F.3d 1214, 1242
2  (9th Cir. 2000). While the motion is not converted into a motion
3  for summary judgment, "the party opposing the motion must
4  [nonetheless] furnish affidavits or other evidence necessary to
5  satisfy its burden of establishing subject matter jurisdiction."
6  Id. When deciding a factual challenge to subject matter
7  jurisdiction, district courts may only rely on facts that are not
8  intertwined with the merits of the action. Id.

**III. Analysis**

10  Defendant moves to dismiss the complaint on three grounds: (1)
11  that the Fifth Amended Complaint exceeds the scope of this court's
12  order granting plaintiff leave to amend the complaint; (2) that the
13  court lacks subject matter jurisdiction because of plaintiff's
14  failure to exhaust administrative remedies; and (3) that plaintiff
15  has failed to state a claim. The court addresses subject matter
16  jurisdiction first. Steel Co. v. Citizens for a Better Env't, 523
17  U.S. 83, 93-94 (1998).

**A. Subject Matter Jurisdiction**

19  Defendant argues that this court lacks jurisdiction over
20  plaintiff's claims because plaintiff has failed to properly exhaust
21  the EEO process for some of his claims. Defendant's argument is
22  based on the timeliness of plaintiff's complaints to the EEO
23  office, and his failure to present some claims to the EEO office.

24  A federal employee may file an employment discrimination claim
25  in district court after exhausting administrative remedies. As a
26  "precondition to filing [an employment discrimination claim in

17

district court], the complainant must seek relief in the agency that has allegedly discriminated against him." <u>Kraus v. Presidio Trust Facilities Division/Residential Mgmt. Branch</u>, 572 F.3d 1039, 1043 (9th Cir. 2009)(quoting <u>Brown v. GSA</u>, 425 U.S. 820 (1976)). Following an allegedly discriminatory act, a plaintiff must consult an EEO counselor within 45 days. 29 CFR 1614.105(a)(1). This time limit may be extended by the agency or the EEOC if the complainant reasonably did not know about the discriminatory action, despite due diligence.  29 CFR 1614.105(a)(2).

For a hostile work environment claim, the continuing violations principle applies. A plaintiff must consult an EEO counselor within 45 days of any act that is part of the hostile work environment. Discussing the statutory period for filing a case in district court after the EEOC process has been exhausted, the Supreme Court has held that because "the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." <u>AMTRAK v. Morgan</u>, 536 U.S. 101, 118 (2002).

In this case, plaintiff initiated three separate EEO complaints. On or about March 21, 2006, plaintiff contacted an EEO counselor to complaint about retaliation and age discrimination. Plaintiff later filed a formal complaint alleging discrimination and hostile work environment "through a series of actions beginning

1   on or about November 4, 2005." FAC ¶ 6. This complaint was assigned

2   the number HS-06-ICE-002648 ("2648"). On or about February 22,

3   2008, plaintiff contacted an EEO counselor to complain about

4   retaliation and age discrimination. He filed a formal complaint in

5   that matter, number HS-08-ICE-004459 ("4459"). FAC ¶ 18. On or

6   about July 25, 2008, plaintiff contacted an EEO counselor to

7   complain about retaliation and age discrimination. Plaintiff filed

8   a formal complaint, HS-08-ICE-007526. FAC ¶ 22. Each of the EEO

9   complaints alleged "discriminatory non-selection of two positions

10  for which plaintiff had applied," in addition to hostile work

11  environment.   Defendant argues that this court lacks subject

12  matter jurisdiction over "any adverse action which [plaintiff]

13  alleges occurred before February 16, 2006 (for his first EEO

14  complaint), January 8, 2008 (for his second EEO complaint), and

15  June 11, 2008 (for his third EEO complaint)." Mot. at 8.

16      Indeed, the FAC alleges adverse employment actions beginning

17  around November 2005, when plaintiff's appointment to a permanent

18  position was cancelled. FAC ¶ 37. However, each of plaintiff's

19  claims for relief allege hostile work environment. As noted,

20  hostile work environment claims encompass a series of incidents

21  that cumulatively add up to an adverse employment action. A hostile

22  work environment charge is timely filed if one of those incidents

23  occurs within the statutory period. Plaintiff has alleged that a

24  series of events constitute a hostile work environment, altering

25  the conditions of his employment. Those alleged incidents include,

26  but are not limited to: denial of annual leave without explanation;

19

1   the agency's failure to issue an adequate vehicle in which to

2   perform his job duties; the agency's failure to assign a partner

3   to plaintiff; denial of union representation; a five-day

4   suspension; a search of plaintiff's office and seizure of his

5   property. Accordingly, defendant's argument that this court lacks

6   jurisdiction to hear any claims arising outside of the 45-day

7   window for each EEO complaint is unavailing insofar as plaintiff's

8   hostile work environment claims.

9       Plaintiff is very unlikely, however, to recover separately for

10  discreet acts that occurred outside the statutory window for each

11  EEO complaint. For example, plaintiff alleges that on November 13,

12  2005, he was not placed in a Chief position. FAC ¶ 43. This

13  occurred more than 45 days before plaintiff ever complained to an

14  EEO counselor. Plaintiff is unlikely to recover any lost wages

15  related to his non-hire for that particular position, although the

16  incident may be a component of plaintiff's hostile work environment

17  claim, for which he can recover compensatory damages.[2]

18      Defendant additionally argues that some of plaintiff's claims

19  were never presented to the EEO office. Indeed, it is difficult to

20  discern from the FAC which of the various "non-hires" were

21  presented in EEO complaints. A declaration by plaintiff, filed with

22  his opposition to the motion offers some clarification. The court

23  disagrees with plaintiff's contention that "it is easy to discern"

24  _____

25      [2] For each claim, plaintiff seeks "retroactive promotion to
    the position applied for, back pay, front pay, and other remedial
    relief." Plaintiff also seeks compensatory damages for his first,
26  second, and third claims. FAC 39:14-16, 23-25; 40:4-6, 13-15.

from the timing of the events alleged in the complaint that Morgan
had exhausted particular non-hire claims. Oppo. 8:22-24. In fact,
almost nothing has been easy for the court to discern in any of
plaintiff's many amended complaints.

Plaintiff's first EEO complaint, number 2648 filed on March
21, 2006, included plaintiff's non-hire claims for vacancy
announcements LAG-FSP-541798-SM-17, LAG-FSP-101859-SM-26 and LAG-
FSP-101313-SM-24. Plaintiff learned of his non-hire for those
positions on November 13, 2005, February 21, 2006, and February 26,
2006, respectively. Only the latter two of these non-hires occurred
within 45 days of plaintiff's EEO complaint. Therefore, the court
finds that plaintiff's claim for non-hire for vacancy announcement
LAG-FSP-541798-SM-17 was not properly exhausted, but that the other
two were.

Plaintiff's second EEO complaint, number 4459 filed on
February 22, 2008, exhausted plaintiff's non-hire claims for
vacancy announcements LAG-FPS-137696-LP-183 and LAG-FPS-145334-SM-
91. Plaintiff learned of his non-hire for those positions on
January 28, 2008, and January 23, 2008, respectively. Both of those
non-hires were properly presented to the EEO office.

Plaintiff's third EEO complaint, number 7526 filed on July 25,
2008, exhausted plaintiff's non-hire claims for vacancy positions
LAG-FPS-168698-LP-275 and LAG-FPS-168719 LP-276. Plaintiff learned
of his non-hire for both of those positions on July 9, 2008, within
45 days of complaining to an EEO counselor.      In addition to
the specific non-hire claims discussed, plaintiff also complained

1  of retaliation and hostile work environment in each of his EEO
2  complaints.

3      Accordingly, the court concludes that it has jurisdiction over
4  plaintiff's claims.

5  **B. The Scope of this Court's Prior Order**

6      Defendant argues that the Fifth Amended Complaint exceeds the
7  scope of this court's prior order. This court issued an order on
8  February 10, 2011 granting defendant's motion to dismiss, and
9  granting plaintiff leave to file an amended complaint.
10 Specifically, the court instructed plaintiff to simply the factual
11 allegations in the complaint. The court also allowed plaintiff to
12 include allegations of retaliatory acts stemming from an EEO
13 complaint filed in March, 2006, and to allege retaliation for his
14 participation in the Neibauer and Bailey matters, beginning in
15 April 2007. February 10, 2011 Order, ECF No. 55.

16     Plaintiff's Fifth Amended complaint is much improved, compared
17 to previous versions. As defendant states, some factual allegations
18 are incorporated into claims for which they are irrelevant.
19 Defendant states that plaintiff's first claim for relief, third-
20 party retaliation for his wife's activities, incorporates facts
21 that appear to be irrelevant to his wife's role as an attorney
22 representing other agency employees. However, the paragraphs
23 incorporated, although they do not mention Ms. Becker, support
24 plaintiff's claim of hostile work environment in retaliation for
25 his wife's activities. The same can be said about defendant's
26 arguments with respect to plaintiff's second, third, and forth

1  claims for relief. Accordingly, the FAC does not exceed the scope
2  of this court's February 10, 2011 order.
3  **C. Failure to State a Claim**
4      Defendant argues that plaintiff's complaint should be
5  dismissed because plaintiff has failed to allege that the
6  discriminatory acts were the result of an unlawful discriminatory
7  motivation. Mot. 10.
8      In employment discriminations cases, "under a notice pleading
9  system, it is not appropriate to require a plaintiff to plead facts
10 establishing a prima facie case. . ." under the McDonnell Douglas
11 framework. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (U.S.
12 2002). Twombly explicitly did not overturn this holding. Twombly,
13 550 U.S. at 569-70. In Swierkiewicz, the plaintiff alleged that he
14 was terminated for reasons that are prohibited by the ADEA and
15 Title VII. The Court held that his complaint adequately stated a
16 claim by describing several events leading to his termination,
17 providing relevant dates, and including the ages and nationalities
18 of some of the persons involved in his termination. As noted in a
19 prior order in this case, it is sufficient, for example, for
20 plaintiff to allege that he was denied a promotion, and that a
21 younger and less qualified person received the promotion, or other
22 facts to support that he was denied the promotion because of his
23 age. Morgan v. Napolitano, 2010 U.S. Dist. LEXIS 105600 (E.D. Cal.
24 Sept. 22, 2010).
25      Here, plaintiff has alleged facts showing animus towards older
26 employees. The FAC alleged that Durette expressed his preference

1  for hiring "youthful and vigorous" employees, and that Durette
2  maintained a "hit list" of older employees that he wanted
3  eliminated from the agency. Plaintiff has also alleged that in
4  several instances, he was passed over for promotions in favor of
5  younger, less qualified employees. From these factual allegations,
6  the court can plausibly infer that plaintiff suffered adverse
7  employment actions because of his age.

8       Similarly, plaintiff alleges that Durette complained about
9  plaintiff's wife's legal representation of other agency employees.
10 Although Durette's alleged comments occurred in 2005, outside the
11 statutory period, they are evidence of Durette's animus towards
12 plaintiff's wife's anti-discrimination activities. The court could
13 also infer animus for plaintiff's wife's activities from the email
14 sent on October 28, 2005. Although the email might be evidence that
15 management was concerned that Morgan was improperly sharing
16 information with his wife, the email could also demonstrate
17 management animus towards his wife's activity and management's
18 perception that he was aiding and abetting that activity. Both
19 theories are plausible.

20      Defendant further argues that plaintiff's first claim for
21 relief, that he was retaliated against for his wife's activity, is
22 prohibited by the plain language of Title VII. Defendant argues
23 that plaintiff's claim fails because plaintiff has not stated facts
24 showing that he was engaged in any activity for which he would be
25 protected by the anti-retaliation provisions of Title VII. This
26 court has already held that plaintiff may state a claim for third-

1   party retaliation because of his wife's legal representation of his

2   co-workers, since such retaliation would chill enforcement of anti-

3   discrimination laws. Our order stated "in her representation of

4   Defendant's employees, Plaintiff's wife effectively stands in the

5   shoes of those employees and becomes the conduit through which they

6   exercise their Title VII rights." Order 19:6-9, 20:21-23, September

7   23, 2010. ECF No. 32. Moreover, the Supreme Court recently held

8   that the anti-retaliation provisions of Title VII do prohibit

9   retaliation against close family members of those who complain

10  about unlawful discrimination, since such retaliation might

11  dissuade employees from filing charges. Thompson v. North American

12  Stainless 562 U.S. ___ (2011). In Thompson, an engaged couple both

13  worked for the same company. Three weeks after the woman in the

14  couple filed a sex discrimination charge, the plaintiff was fired

15  from his job. Building on the holding in Burlington N&S F.R. Co.

16  V. White 548 U.S. 53 (2006) that Title VII's anti-retaliation

17  provision prohibits a broad range of employer conduct, the Court

18  held that some third-party reprisals violate Title VII. Without

19  establishing a precise rule, the Court explained that "firing a

20  close family member will almost always meet the *Burlington*

21  standard, and inflicting a milder reprisal on a mere acquaintance

22  will almost never do so." The Court further concluded, by applying

23  the "zone of interest" test from Lujan v. National Wildlife

24  Federation 497 U.S. 871, 888 (1990), that the plaintiff (the man

25  who was fired) was an 'aggrieved party' within the meaning of Title

26  VII, and therefore had standing to sue. The Court held that,

1  according to the facts alleged by the plaintiff, "injuring him was

2  the employer's means of harming [his fiancee] Regalado. Hurting him

3  was the unlawful act by which the employer punished her."

4      As with his age discrimination claim, plaintiff has

5  sufficiently plead his direct retaliation, third-party retaliation,

6  and perceived aiding and abetting claims. Plaintiff has pled facts

7  from which the court can plausibly infer that he engaged in

8  protected activity, that management knew about the activity and

9  didn't like it, and that he subsequently was subjected to adverse

10  employment actions and a course of conduct constituting a hostile

11  work environment.

12  **IV. Conclusion**

13      For the reasons stated herein, the court ORDERS as follows:

14          [1] Defendant's motion to dismiss the Fifth Amended

15          Complaint, ECF No. 58, is DENIED.

16          [2] A status conference is SET for July 11, 2011, at

17          2:30 p.m. The parties SHALL file status reports no later

18          than fourteen (14) days before the status conference.

19  IT IS SO ORDERED.

20  DATED:  June 16, 2011.

21

22

23  LAWRENCE K. KARLTON
    SENIOR JUDGE

24  UNITED STATES DISTRICT COURT

25

26